Madam Clerk, please call the next case. 114-2176, C&B Steel Corp. v. Workers' Comp'n Counsel, you may proceed. Good morning, Justices. I am Laura Ruback, representing the interests of C&B Steel. I know that you guys have read these briefs, so I'm going to try to briefly narrow this down. Basically, my appeal to you involves two issues, and that would be the Geary v. Industrial Commission case, which I'm sure you can probably all recite by me. Yeah, I can't hear what you're saying. Oh. So if you would just say it. Sure. Hopefully it's not too close. Okay, so the first involves Geary v. Industrial Commission, which I know is a case that you can all probably recite by memory. And the second involves the issue of waiver and the two-doctor choice rule. The Geary argument really involves two parts, and the first is whether or not the employer was surprised, and the second is whether or not the entire deposition should have been stricken, as opposed to only striking the causation opinion, as the lower courts found. So as to the issue of surprise, there are two leading cases really that address this issue, and that would be the case of Holmbright and the case of Geary. And the Holmbright case stands in my position, but the Holmbright case stands for the proposition that undisclosed opinion testimony does not always constitute surprise. In that case, the claimant argued, well, in the Holmbright case the court found that the employer was not surprised because it had knowledge of the treatment and condition for which the doctor would be testifying and also had the records that the doctor generated as a result of that treatment. So the employer could not argue that it was surprise regarding the doctor's testimony, even though the doctor didn't author an actual narrative report. In this case, the doctor, my case, the doctor did author a narrative report in November of 2011 causally relating the petitioner's treatment through September 3, I think, 2010. We did not, the employer did not object to that treatment. We didn't have any issue to the causal connection of that treatment to the accident. There was no dispute. So when opposing counsel requested the deposition of Dr. Bruckner, we did not object. We allowed it to proceed. There was no dispute. When we started deposing the doctor, it became clear that the opinion was, in fact, different, causally relating an additional year and a half of treatment to the accident as opposed to the related treatment that we did not dispute. The treatment that the doctor related to that accident was, in fact, disputed treatment. So the causal relationship of the additional year and a half of care is what the dispute really surrounded. So why should the entire deposition have been stricken as opposed to only that portion which took you by surprise? That is the second part of this, and I think, first of all, when the employer became aware that the petitioner was examined right before the deposition, it changed everything. Had we known, let me back up, had we known, let's say, three days before the deposition, that the doctor had just evaluated the petitioner again, the deposition would have been objected to. At that point, we would have needed to secure all of the medical records between September 3, 2010, and the date of the deposition in 2012, April of 2012, to find out what treatment had taken place, what was going on, get an independent medical evaluation to address that, and then we would be able to properly cross-examine Dr. Reckner regarding that ongoing treatment. That period of time was in dispute, so we would have needed to do our due diligence and investigate the treatment that had taken place since the September 3, 2010 visit. We weren't afforded that opportunity. But what did the Commission do? What did they strike? They only striked the statement of the doctor stating that I... They struck the statement of the doctor that related to an opinion that had to do with something that occurred after September of 2001. They left on what you were well aware of, and that was his opinions up to the point in time in September when he saw them. So you're not taken by surprise as to what he had to say about that, are you? I wasn't taken by surprise that he related the treatment through September of 2010. Okay, and they struck everything that had to do with what his opinions were post-September 2010. No, they only struck his causation statement regarding that. Counsel, you indicated in your brief, it says, in this case, the rest of the deposition transcript, and by the rest, I'm assuming beyond the opinion, the causal connection opinion that was stricken, the rest of the deposition transcript contains testimony regarding the doctor's opinions relative to the progression of the claimant's condition, a condition employer was not prepared to discuss. So what is it that the doctor testified to in terms of the progression of the claimant's condition? Well, he testified about myelopathy and the nature of its progression, and that the petitioner's condition continued to progress and it continued to worsen, and that was bolstered by his examination. My understanding, or our understanding, actually Ross's understanding at the time, was that through September of 2010 there was minimal treatment, and then after that we knew he moved to Florida, and we didn't have any of the medical records, and that was in February of 2011, and we didn't have any other medical records, so we didn't know that he had really continued treatment. So the fact that he continued treatment and the fact that the doctor was able to then testify that his condition still existed and was in fact worse, that's a different causation opinion altogether. It's a different analysis that the doctor basically had to undertake after his examination. If he didn't have that examination, he would only have talked about what that treatment was up to September of 2010, and at that point the petitioner wasn't even diagnosed with myelopathy, if my memory serves me correctly. That wasn't until later. It was basically an aggravated cervical strain condition that required treatment, and then Mr. Bottoms moved and he basically stopped treating. So when he went, when Dr. Breckner evaluated him in 2012, everything sort of changed because, go ahead. What is it, in your brief you're explaining this, and I'm wondering if you could just go a little bit farther here. Sure. Because you're saying it was a practical consequence in regards to the sequencing of the IME. Can you explain that? Well, if he had notified us of this evaluation, we would have put off that deposition, and like I said, we would have secured all of the medical records, and we would have had Dr. Anderson re-evaluate, who is our expert, re-evaluate the petitioner's condition and provide an opinion as to, you know, where he currently stands. Presumably Dr. Anderson would have stood by his previous IME opinion in 2011, stating that his condition is not related, this is where he stands right now, he does have a condition. You will recall he had a three-level cervical fusion nine months before the accident. So he did have a condition. The question is, what was it related to? Dr. Anderson would have provided his opinion. Then we would have been able to cross-examine Dr. Breckner regarding Dr. Anderson's updated opinion in the petitioner's treatment since September 3, 2010 and through April 24 or whatever. Well, that would have been advantageous. I guess what I'm struggling is, you had noticed that Breckner would testify regarding his treatment of the claimant and his medical opinions relating to the treatment up to September 3, 2010. Yes. Is that correct? That's correct. Okay. So I took that opinion. Well, I don't have a problem with that particular causation opinion, which was contained within the narrative report, which I didn't object to. So that narrative report could have just gone straight into evidence. But the deposition testimony, it's really difficult to just limit it to treatment through that date because the doctor is talking about the progression of a condition that we later found out the petitioner had. So you can't really piecemeal that by saying, well, this is going to stay in and we're going to strike everything else. So what then was the prejudice to you? The prejudice to me was that the deposition was taken under false pretenses. I mean, we were under the impression the doctor was going to testify regarding treatment that wasn't disputed. When it came to light that he was testifying regarding a whole slew of time that was in dispute, that's a different situation altogether, and we would not have agreed to that deposition had we known that. Not at that time. Did another doctor testify to the progression of symptoms past September of 2010? Yes. We had Dr. Anderson evaluate the petitioner after Dr. Brechner's deposition, and then his deposition was then obtained. So in terms of prejudice, I mean, was this duplicative? I don't think it was duplicative because I think there's a ñ my position is that there's an order to this. If we can just ñ I don't think that it was ñ by taking Dr. Anderson's deposition and getting the IME after the fact, we're left scrambling to try to fix what was sprung on us. But then it did confirm, I mean, your side of the case. Anderson's opinion was your favorite, correct? Yes. So hypothetically, what if you have three or four doctors testifying to the same thing and one of them was erroneously admitted? Would a court overturn that verdict, let's say, because one of them was erroneously admitted? I would suppose it would depend on the facts and how it was erroneously admitted. I mean, I think that as a matter of fairness in policy, there's certain types of conduct that shouldn't be tolerated. And if attorneys are allowed to spring surprise on other attorneys, then that sort of ñ Well, I understand that, but isn't there another component to this? I mean, if you have, as you say, Justice Harris talked about duplicative, if you have evidence coming in the same way, would you say, well, this was wrong, so we're just going to ignore all the other evidence that supports the decision and overturn it because it was simply wrong? Do you see a problem with that? Now, if there was no evidence to support the proposition, then I think your argument would be more compelling. But you've acknowledged that Anderson testified essentially to the same thing on your side of the case. Yes, he did. I mean, I don't dispute that. But anyway, that's an argument to be brushed, you know, thrashful and make a decision on. Right. So let's see. I had, I guess, the only other issues that I wanted to address regarding the deposition being struck is that since it shouldn't have occurred in the first place, my opponent shouldn't have the benefit of having the transcript and evidence because of the way it was obtained. And that striking the causation statement alone doesn't rectify the damage done, and neither does obtaining Dr. Anderson's deposition after the fact rectify it, because he should have had the opportunity to evaluate the records in the petitioner before any depositions were started. And like I said, we never did then get the opportunity to recross Dr. Breckner regarding all of that treatment after that deposition. So we were, we lost that opportunity. And that's really it, I guess, with respect to Surprise. I mean, you guys know, I know you are all very aware of the Holmbright and the Geer cases, so I guess I probably don't need to go into any detail with that. Okay. Okay, so then the next issue is the waiver issue and whether or not I waived the pre-doctor choice, sorry, argument. The claimant argues that this issue needs to be listed on the request for hearing form. I contend that it falls within the causation and medical liability disputes that were set forth in the request for hearing form. This dispute falls under Section 8A, and there's no statutory or commission rule requiring every single issue within those broader issues to be outlined separately. The Greeney case, the court in Greeney v. Industrial Commission, basically pointed out a commission rule, they were citing another case, Montgomery Ward Life Insurance, that pointed out the difference between Rule 7040.70 and Section 19B. There's a contradiction between those two rules. Section 19B holds that the jurisdiction of the commission to review the decision of the arbitrator shall not be limited to the exception stated in the petition for review. Whereas Rule 7040.70 states that the commission may only consider issues which were raised in both the review stipulation form or its equivalent and the statement of exceptions. Either rule in this case was not jeopardized because everything was checked in the statement of exceptions and in the petition for review. It was argued at the arbitration level as well. It just wasn't specifically enumerated as a separate issue on the request for hearing form. But I didn't believe that it needed to be because we objected to medical liability and causation in part for that reason. There may have been... But how would the arbitrator know that you were an issue by seeing the number of positions along? It's in the brief. The theme this morning seems to be inference. You've heard the earlier argument. So to infer, well, there must have been a two-position rule an issue as well? Well, no, because I argued it in my brief. Did you check the backs and so on? There isn't a box to check for that. What did you put on the form that indicated? Medical liability and causal connection. Yeah, but when you say medical liability, did you put medical liability because he exceeded his two-position? I didn't separate that out. Or did you say medical liability? You said medical liability. It's just medical liability. So what's the arbitration? For multiple reasons. I mean, that could be based on the fact that he never incurred the bill or the bill had to do with some other portion of his body. That was part of it. There was those issues. There were issues about causal connection regarding the treatment that he received. No, no, if you're talking about the two-physician rule now. Right. Where did you place anybody on notice in your brief that you were talking about the two-physician choice? In my brief? You mean on the request for hearing form? Yes. Where did you tell him? Well, Judge Medical Justice, I'm sorry, medical liability includes all of those reasons. It includes the fact that he never appeared at a hospital and yet submitted a phony bill, too. Right. And we don't ever enumerate all of those reasons why we object to medical liability. I think you state the grounds. And if you don't state the grounds for the objection to medical evidence, what have you stated? You've stated nothing.  By saying medical bills, he's supposed to define it as everything that could conceivably have to do with medical bills? That's the problem with there being no discovering workers' compensation. Well, that may be the problem. That's a big problem. I didn't even receive most of the money. If you want to say somebody should not get reimbursement for a medical expense for a doctor because the doctor was outside his two-physician and referral availability, then say it. And then he knows what he's defending, and then he'll defend it. I would agree. However, in this case, I didn't even know half the doctors the petitioner treated with until the day of trial. That's why this case was bifurcated. He treated with a host of physicians in Florida that we weren't aware of, nor did I receive the medical records. We had to bifurcate the case to allow opposing counsel to provide me with that information. And then when we came back, you know, the arguments were made. But, I mean, in the same way, I wasn't put on notice of all the medical records and all the treatment the petitioner had, more than bills, until the date of trial. You being put on notice is not the question I was asking. I'm sorry? Never mind. So what your argument is is that we're talking about the hearing point? Yes. Okay. And you take medical liability? Yes. Right? And causation. And causation? Yes. And whose burden is it to prove their claim? Petitioner's. And you're saying medical liability means liability, employer's liability for medical expenses on whatever source, right? Medical expenses, medical causation, medical whatever, yeah. I mean, we don't generally parse out, you know, the accident histories are in dispute or the mechanism of injury is in dispute. Those aren't generally things that are parsed out on the request for hearing form, and there aren't boxes to check for all of that. And what you're saying is the claimant's going to have to establish that this medical bill is a legitimate bill under the act because it is within the chain of referral. Exactly. Among other things, but that's one of them. Right. And that's their burden. Yes. And you're disputing it from day one if you want to. Yes. Right. And I don't believe that the issue was waived when it was argued at all the different levels. It actually is not waiver, it's forfeiture. Okay. Waiver is not the proper term. Forfeiture is the proper term. There is a known relinquishment. Okay. That's not the case here. I'm beginning to suspect that even though you hope your argument here will carry the day, if this issue comes up before, I have a feeling it might be specified. Probably the next time. I have a feeling you are correct. And it has since then. Okay. Thank you, Justice. Thank you, Justice. May it please the court, counsel, my name is John Popelka. I'm here on behalf of the Applee, Robert Bounds. He is also a cross appellant. I'd like to address first this forfeiture issue concerning the two-choice rule on two different grounds. The first is that it was not placed into dispute at the time of arbitration on either the stipulation sheet or, as I've pointed out by the attachment to my reply brief, actually no, to my original brief, the transcript of the arbitrator reading the issues into evidence. The arbitrator indicates that at issue today is causal connection for petitioner's current condition of well-being, unpaid medical expenses, and then she stops herself based on liability. Correct, counsel? Ms. Rubick? Yes, judge. Goes into the TTD dispute, goes into the medical, prospective medical penalties. Then the arbitrator asks, are there any other issues? And counsel said no other issues. Well, what's the liability? What's the liability? I'm not liable for these reasons or I'm not liable, you know, isn't that kind of like a general denial of liability? It is a general denial, but if we knew that, well, so let me get on then to the waiver of the actual two choices because I think it's a moot point. The first place my client went for medical care was the emergency room at St. Catherine's Hospital. They recommended at the emergency room that he follow up with his physician. He did that the next day, Dr. Brechner, the physician who was the subject of the next argument concerning the gear objection. Dr. Brechner then referred him to a surgeon at Northwestern. That was Dr. Gaurishan. Dr. Gaurishan made a recommendation at some point in the medical care that my client be seen by a neurologist. Dr. Gaurishan had in mind that he come back to Northwestern for a neurologist. My client lived in Indiana. So what my client did instead was he called Dr. Brechner and said, Dr. Brechner, Dr. Gaurishan referred me to a neurologist. Can you give me a name of somebody down here? He did. He gave him the name of Dr. Spence. My client went to Dr. Spence. So Dr. Spence is actually within the chain of referral from Dr. Brechner because there's a direct referral there, but also potentially from Dr. Gaurishan. I say potentially because we eventually find out Dr. Spence is not a neurologist. He ordered an MRI and a GNCV, a lot of different tests, but he was not a neurologist. My client then goes back to see Dr. Gaurishan. Dr. Gaurishan looks at those records and says, basically, he's not a neurologist. I still want you to see a neurologist. Well, within a couple of weeks of that appointment, or actually I think a couple of days of that appointment in January, he moves to Florida with his wife. His wife gets a job, and they move down to Florida. He goes to a free clinic. No, he did not go to a free clinic. He went to a neurologist, Dr. Khalidi. Dr. Khalidi's records were provided to counsel. Let me back up just a little bit, if you don't mind. Dr. Spence made the recommendation for all these medical tests. They were not authorized. We had sent the request for that to the respondent. They were not authorized. There was no treatment authorized from that early referral on. So there was no additional medical care that the respondent was not aware of. So we get to Florida. We're with Dr. Khalidi, who is a neurologist. That's within the chain of referral from Dr. Gaurishan, who wanted him to see a neurologist. Dr. Khalidi had two recommendations, a cervical MRI and be seen by a neurosurgeon. We sent a fax. It's part of the record for authorization for that treatment. It was not authorized. Neither the cervical MRI nor the referral to a neurosurgeon. They were aware of Dr. Khalidi. Dr. Khalidi's recommendation was to be seen by a neurosurgeon. My client went to a neurosurgeon in Florida, Dr. Hershkowitz. That is all of the medical care in this case, other than my client didn't go to a free clinic because he ran out of Vicodin. Dr. Gonzalez had a free clinic where he was given a prescription for the Vicodin, but not the Vicodin itself. But he didn't have to pay for those services. So every physician that my client saw was within the chain of referral. So the two-choice argument is a main issue anyway. But now I want to go into the surprise argument with Dr. Breckner, because I think it ties into some of what counsel was saying. We took the deposition of Dr. Breckner, who was the initial physician. One of the reasons we did that was about a year prior to this accident, my client, who's a juryman ironworker, had a three-level fusion. He went back, and Dr. Breckner was the assistant physician in that surgery. He had seen a Dr. Sheiman. And he had a three-level fusion and was released to return back to full-duty work in three weeks' time. And he went back in three weeks' time to being an ironworker. He described that he didn't get any real medical care after that. He had one follow-up appointment with Dr. Breckner, and then a second one where he had spasms in his arm. Not numbness or tingling, but just spasms in the left arm. Got some medication, and he worked as a juryman ironworker from November 2009 to July of 2010. So he sees Dr. Breckner initially. Dr. Breckner gave the opinion that his condition was causally related to this injury at work. Because four days prior to the accident, actually a week prior to the accident, he was at a Walgreens. And he went and got a blood test. And he saw his blood pressure was high. So he went and saw Dr. Sheiman, or excuse me, Dr. Breckner. And Dr. Breckner said, okay, you've got high blood pressure. He also complained of some neck pain. He said just a normal neck pain, no radiculitis. Can we get to the surprise part? Pardon? Can we get to the surprise part? Yes, Your Honor. So we put him on notice that, we sent a notice of deposition to the other side, stating specifically that we would be asking about past, present, and future medical care. When we put that, the deposition is attached to my notice. I'll read it to you. The notice said, we will elicit testimony from Dr. Breckner concerning all disputed issues, including but not limited to accident history, causal connection, reasonableness, and necessity for past, present, and future medical care and treatment and expenses. That's what you said in the notice. And that's what the notice of deposition, which is also attached to the brief, indicates. So Dr. Breckner issued a letter back in November of 2011 in which he states, I cannot form an opinion on whether claimant's fall on July the 19th, 2010, has caused ongoing pain or disability, meaning beyond September the 3rd, 2010. Right, beyond the last day he saw her. And then you have him examined by Breckner on April the 20th, 2012, and take his deposition four days later, and you never even bothered to tell the other side that he's got a new opinion that he gave to you based upon his examination of April 20th. Why isn't that taking the other side by surprise? I'll explain why. My client flew into town from Florida and saw Dr. Breckner four days before the deposition. I didn't know what Dr. Breckner's recommendations were. I didn't get any medical records. We didn't have any opinions. As a matter of fact, if you look on my brief, I attached the copies of the deposition where this comes up, and Dr. Breckner at the beginning of his testimony, we go through all the causal connection opinions prior to that four days prior, and then Dr. Breckner starts to, when did you last see Mr. Bonds? I last saw him April 20th, about a week ago, yes. Do you have any charting books? They're not made up yet. I haven't signed off on anything yet. Could you tell us what your findings were? Well, he gave me this history. Can you tell us? He explained the exam that he gave. He explained what his findings were. And then the question was, what was your recommendation? There's where the objection comes in, at the recommendation. I would submit to you that this objection was not timely. Counsel was on, first of all, Don't get away from Judge Hoffman's question. What about the surprise? The surprise? Yeah. Mr. Sabella's here. Yeah. Mr. Sabella and I waited for Dr. Breckner for almost 45 minutes. We had a lot of conversation. None of it is on the record. None of it is on the record. Are you going to tell us you didn't know what he was going to say? Well, at what point is it? Look at the transcript. Was he surprised when he said he saw 48 files? In all cases where the examination of a claimant is made by a surgeon engaged by the injured employee, now that's Breckner, and the employer has no surgeon present at the examination, we know that's true, it should be the duty of the surgeon making the examination of the instance of the employee to deliver to the employer or his representative a statement in writing of the condition and extent of the injury to the same extent that that surgeon reports to the employee and the same shall be an exact copy of and furnished to the employee, said copy to be furnished within 48 hours. Mr. Rapelka, are you going to actually tell us you didn't know what he was going to say from his examination on the 20th? Are you going to represent that to us? No, I'm not representing that to you. You knew what he was going to say. I didn't have his opinion, but I knew. How did you know what he was going to say if he hadn't communicated with him? I didn't know what he was going to say. I hadn't communicated with him until the deposition was about to go forward. I met with him for a few minutes beforehand. That was the first time I had any contact with him. I asked him if he had chart notes. He had none available. We then go into the deposition, and he says, I saw him four days ago, and this is the history, this is my exam results. Is there a surprise that he saw him four days ago in that transcript? Do you see that surprise anywhere? Wait a minute. You saw him four days ago? I didn't know anything about this. I object to any questions about this. No. Let's not get away from the objection part. Let's talk about the surprise part. This is the surprise. Well, you were surprised, too, then? Was I surprised by what he said? No, but the surprise was important. Hold on, hold on. He gave an opinion a year before that said, I can't give you an opinion on whether this man's condition has anything to do with that which comes after ongoing problems, after September the 3rd. Now, are you going to tell me that you had no knowledge he was going to testify to what his condition was subsequent to September the 3rd? No, I absolutely had knowledge. Oh, you did? Yes. Do you think he was surprised by that? It was Mr. Sabella. Do you think he was surprised by that? I do not. And if you look at the transcript, I think you can see he wasn't surprised because when I brought up that appointment four days prior, there's nothing. There's silence. So we're back to the inference test, I'm worried. We can infer he was surprised, right? I'm not suggesting that, Your Honor, that there's an inference that needs to be made there. What I'm saying is he said previously when he saw him, I can't give an opinion beyond the last date I saw him. Right. Then when he saw him, he did give another opinion. However, counsel said to you, we would have changed courts because the treatment would have been, we didn't know about all the treatment. There had been no treatment. There hadn't been any treatment since before he left Florida. There had been recommendations for treatment that they denied. And what did Dr. Gartner say? What was his surprising testimony? His surprising testimony was that he should be seen by a neurosurgeon, and he recommended Dr. Schumann since he did such a good job before, that he still could not perform gainful employment based on his exam, and that his condition continued to be causally related. Those were all subject of the notice of deposition that I introduced into evidence. Counsel, if you would have put in your notice of deposition based upon his examination of the 20th, was it April of the year? Yeah. Yeah. If you would have told them that, you might have an argument. How in heaven's name did they even know he was examined by this doctor on that day or any day subsequent to September the 3rd? Well, I would just refer your direction back to the actual deposition transcript to see. There was a point that obviously this deposition could have been continued before it started. It didn't. It wasn't. It went forward. I was allowed to ask three or four questions about that office visit four days prior. You seem to be suggesting that we determine whether or not it's a surprise opinion on the reaction of opposing counsel. Okay. Surprise opinions. Okay. We're talking about previously undisclosed opinions. Okay. And you would acknowledge those were previously undisclosed prior to the deposition? Right. Even undisclosed to me, yes, I would. And there wasn't an objection, but the record shows there was an objection. There wasn't literally an objection, but there was not a request that the testimony be stricken. The motion to exclude is made. Mr. Papilka. Okay. I'm going to leave this issue alone. No, no. I think the real argument is should the whole deposition have been stricken or not responded yet. I don't think you're going to make it on whether the part that was stricken stays stricken. Right. And I think it's a moot point because the causation opinion of the commission, which is not an issue here now, remains intact whether it is or isn't. It's really a moot point. So I'd like to move on to my cross-appellate. Penalties and fees. Yes, penalties and fees. Now, as I said, my client saw Dr. Breckner four days before for a blood pressure check, and it was essentially a normal exam. He complained he had some problems with the neck, but there was no radicular pain. When counsel sent Dr. Anderson the cover letter summarizing the medical care, it came across really only as there was neck pain. He was complaining of neck pain prior to the injury. Is that enough for penalties? No, I don't think so. Then the doctor gives his report, and his conclusion in his report is that his condition is causally related to the prior condition. Well, they knew it wasn't causally related to the prior condition because he hadn't received any medical care for, at that point, almost eight or nine months. And he'd really received no medical care after that surgery anyway. Is that enough for penalties? I'm saying you don't even need to base the penalty decision on that alone. We get to the doctor's deposition. At his deposition, he's been provided Dr. Breckner's transcript of his deposition. And he testifies, and he doesn't change his opinion on direct examination. But on cross-examination, I asked him, well, let me see the transcript that you looked at for Dr. Breckner. And there's only five or six pages, pages 19 to 23 of the deposition, which doesn't relate at all to Dr. Breckner's testimony about, I saw him four days prior. It was a perfectly normal exam. I saw him four days later, and there was a dramatic change in his condition, including a radiculopathy down the arm. That was Dr. Breckner's testimony. And they withheld that portion of his deposition from Dr. Anderson for his evidence deposition. We need to parse this out. First of all, you're seeking penalties under 19L. That's the nature of the late fee. You can agree on that, right? Yes. Okay. Did the employer offer any explanation or justification for its cessation of claimant's TTD benefits? It did not. They were terminated February 20, 2011, as I indicated in my brief. There was no reason why he didn't see Dr. Anderson until March, excuse me, May 6. Have they argued in your brief that they responded to this issue on appeal? I have not seen that responded to. Then I don't know that you need to spend a lot of time on it in that particular phase of it. Okay. But in terms of the section 19K penalty and the attorney's fees, my argument is there was obviously a dispute whether this was causally related or not, or whether it was due to the prior surgery. They withheld the information from their expert that could have allowed their expert to know exactly what Dr. Bruckner's opinion was and to know the true state of his condition prior to the injury so that he could make a well-informed opinion. Dr. Anderson is a very good surgeon. He's got a very good reputation. At Rush, I don't have an issue with Dr. Anderson. But I do have an issue with them not giving him relevant portions of Dr. Bruckner's testimony that could have, that goes to the heart of the controversy. And if Dr. Anderson had that information, he could have had the opportunity to say, well, wait a minute now. If Dr. Bruckner said he was normal four days prior and dramatically different, I think I may have to change my opinion. It's no longer related to the prior condition. Let me get the tonality of events correct. Anderson gave an opinion when? His first opinion was May 6, 2011. And so when did Bruckner give his deposition? Dr. Bruckner's deposition was April of 2012. April of 2012. So the influences were relying on Anderson's opinion. Okay. They were relying on Anderson's opinion. Then they send him back to Dr. Anderson again after Dr. Bruckner's deposition for a second examination. They don't provide him Dr. Bruckner's relevant testimony. And then they take his evidence deposition. So there was the opportunity to get him evaluated after the Bruckner deposition. Well, they could have and maybe perhaps should have handled it differently. But the issue is whether the reliance, the employer's reliance on Anderson's 2011 opinion was unreasonable or vexatious. Right. That's the standard, right? Well, my argument is by the time you get to the point where you're taking his evidence deposition and putting the information in his hands that he needs to give an opinion, to pull everything together, if you take the most relevant information and take it out of the deposition transcript and withhold it from him and ask for his opinion, it's garbage in and garbage out. And they knew what they were getting when they withheld that information from him. They knew they were going to get a flawed opinion and they relied on it. Now, why is it important now? He may not be here if he had the opportunity to have looked at it ahead of time. This case wouldn't have dragged through trial, appealed, and we wouldn't be taking up your time today. If he had a chance to look at it and say, well, that's a little different. It does not appear that it was related to the prior fusion because if he was seen and they withheld that office visit from four days prior to the accident, in the information they provided him, he never saw that office note. That was not in the materials he was provided. So they withheld the office note from him and Dr. Brechner's testimony. And I think that's what warrants the imposition of penalties and fees. We're here taking up your time. I've written briefs after brief on this issue because Dr. Anderson didn't get the opportunity to review all the evidence. I think he would have opined differently if he had, based on my knowledge of him as a very qualified and a very honest man. And I think if he would have been given that information, I wouldn't be standing here today. I spell out in my brief the relief we request, the exact dollar amount we ask for, and I would ask for that relief. Thank you. Thank you, Counsel. Counsel, you may reply. Yes. Can I ask you a simple question? Sure.  Because the petitioner was referred for treatment in January, and he never underwent that treatment. Counsel, it's not – it didn't make it into the evidence, but there was correspondence between the respondent and petitioner regarding that fact that petitioner was not seeking the treatment that was authorized because he was not seeking the treatment that was authorized with a terminated benefit. In terms of the withholding of – Here, here, here. This is an appellate court. There's no objections here. That was the reason, but irrespective of that, the withholding of records did not actually happen. Counsel believes that Dr. Anderson didn't have all the records because during his deposition testimony, when he was going through his chart, he couldn't find all the medical records that we gave him. The specific medical record that Counsel is referring to is Dr. Bruckner's July 15, 2010, evaluation, and it actually helps our case. He told – Let's take a look at it. Was the doctor – was Anderson given his testimony appropriately? No. We didn't give him the whole deposition transcript. I mean, the doctor's not going to read a whole deposition transcript. We only pull out the excerpts that were related to the future care that the doctor needed to address during that IME in 2012. So we didn't go back to the past at that point because Dr. Anderson had already reviewed the medical treatment in the past and provided an opinion that he believed his current condition was related to the prior three-level cervical fusion. Is it your usual practice not to give doctors the entire deposition? Some attorneys don't. Sometimes they only – because the doctors don't want to – Doesn't that tie into feeding his argument that you basically cherry-picked different parts to deliberately and unreasonably withhold information? And that's sort of argument of bad faith is what he's saying. That's the reason you did that. And now you've exposed yourself to that argument. The safest course would have been to give him the whole thing, right? Yes, Judge, I agree. I had the entire deposition. Yes. And then just highlight certain points. Yes. But I don't think that his argument that we withheld records supports that because the record that he's referring to, he notes that the petitioner was positive for chronic back pain and neck pain. His current problems were noted to be hand pain, controlled hypertension, and neck pain. For his neck pain, he was to have therapy at home. There's no reason we would withhold that record because it goes to the fact that he was complaining of neck pain and hand pain four days before the accident. So the motivation there isn't clear. We didn't withhold that record. If anything, we'd be highlighting that record because that goes to our position that his condition was not related to, or his post-accident condition wasn't related to the accident but his prior condition. That is a moot issue, but it goes to motive, I suppose. I had some other, well, the only other biggest point that I would point out is that Dr. Bruckner specifically testified that he did not refer the petitioner to Dr. Spence. That was all I was going to point out with that unless you have other questions. I don't believe there are. Okay. Thank you all for your time. Thank you, counsel, both of your arguments in this matter. Thank you. We'll take it under advisement. Thank you.